IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DEFENDERS OF WILDLIFE<br>1130 17th Street, NW<br>Washington, DC 20036;<br><br>JACKSON HOLE CONSERVATION ALLIANCE<br>685 South Cache Street,<br>Jackson, Wyoming 83001;<br><br>NATIONAL WILDLIFE REFUGE ASSOCIATION<br>1901 Pennsylvania Ave, NW, Suite 407<br>Washington, DC 20006;<br><br>GREATER YELLOWSTONE COALITION<br>13 South Willson, Suite 2<br>Bozeman, Montana 59715;<br><br>WYOMING OUTDOOR COUNCIL<br>262 Lincoln<br>Lander, Wyoming 82520;<br><br>       Plaintiffs,<br><br>  vs.<br><br>DIRK KEMPTHORNE, in his official capacity as Secretary of the Interior; H. DALE HALL, in his official capacity as Director, U.S. Fish and Wildlife Service; STEPHEN GUERTIN, in his official capacity as Regional Director, Region 6, U.S. Fish and Wildlife Service;<br><br>       Defendants. | Case No. _____ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.      This case challenges the U.S. Fish and Wildlife Service's April 2007 Bison and Elk Management Plan for the National Elk Refuge located in Jackson Hole, Wyoming. The 24,700-acre National Elk Refuge plays a critical role in the region of Yellowstone and Grand

Teton national parks, sustaining populations of iconic wildlife species such as elk and bison that contribute to the ecological integrity of the Greater Yellowstone Ecosystem—the last remaining intact ecosystem in the lower-48 United States. In the challenged plan, the Fish and Wildlife Service decided to perpetuate the winter feeding of elk and bison on the National Elk Refuge. Such winter feeding creates unnaturally dense concentrations of elk and bison, causing high disease levels among the fed animals. Already, the Refuge's fed elk and bison exhibit significantly elevated levels of brucellosis, a wildlife disease that causes pregnant animals to abort their calves. Continued feeding on the Refuge will maintain ideal conditions for the transmission of brucellosis, and also is highly likely to invite a devastating outbreak of lethal chronic wasting disease—the elk equivalent of "mad cow" disease—which would damage the native habitat of Jackson Hole and otherwise disrupt the function and stability of the Greater Yellowstone Ecosystem. While aware of the potentially devastating environmental impacts of its decision to continue winter feeding on the Refuge, the Service failed to discuss meaningfully means of mitigating or avoiding such consequences, instead electing to perpetuate the feeding regime despite its acknowledged impacts and risks. Moreover, the Service's sole nod toward addressing these issues was to propose a "plan to make a plan" sometime in the future that provides neither the public nor agency decisionmakers any relevant information as to what steps might be taken, or when. The Service's Final Environmental Impact Statement, Record of Decision, and Management Plan are therefore contrary to the National Wildlife Refuge System Improvement Act and the National Environmental Policy Act.

## JURISDICTION AND VENUE

2.     This action arises under the National Wildlife Refuge System Improvement Act of 1997, 16 U.S.C. §§ 668dd, et seq. ("Refuge Improvement Act"); the National Environmental

Policy Act, 42 U.S.C. §§ 4321, et seq. ("NEPA"); and the Administrative Procedure Act, 5 U.S.C. §§ 551, et seq. ("APA"), which waives Defendants' sovereign immunity.

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-2202.

4. Venue lies in this district pursuant to 28 U.S.C. § 1391(e) because Defendants Kempthorne and Hall and Plaintiffs Defenders of Wildlife and National Wildlife Refuge Association reside in this district, and because a substantial part of the events and omissions giving rise to Plaintiffs' legal claims occurred in this district.

**PARTIES**

5. Plaintiff Defenders of Wildlife ("Defenders") is a Washington D.C.–based, non-profit membership organization dedicated to the protection of all native animals and plants in their natural communities, including on our country's national wildlife refuges, the only system of federal lands dedicated specifically to the conservation and management of wildlife. Defenders has more than 530,000 members across the nation.

6. Plaintiff Jackson Hole Conservation Alliance is a non-profit organization based in Jackson, Wyoming, with more than 1,800 members. The Jackson Hole Conservation Alliance is dedicated to responsible land stewardship in the Jackson Hole area, and to ensuring that human activities are in harmony with the area's irreplaceable wildlife, scenery, and other natural resources.

7. Plaintiff National Wildlife Refuge Association ("NWRA") is a Washington D.C.–based non-profit membership organization dedicated to protecting, enhancing, and expanding the National Wildlife Refuge System—lands set aside by the American people to protect our

country's diverse wildlife heritage. By combining policy, grassroots development, and public education objectives, NWRA works to strengthen the ecological integrity of our national wildlife refuges and thus to ensure a diverse spectrum of plants and wildlife well into the future. NWRA and its more than 150 member Affiliates have approximately 30,000 individual members.

8. Plaintiff Greater Yellowstone Coalition ("GYC") is a conservation organization dedicated to protecting and restoring the Greater Yellowstone Ecosystem and the unique quality of life it sustains. Central to GYC's mission is maintaining the integrity of the public lands that are the core of the larger ecosystem. Formed in 1983, GYC is a non-profit corporation and has approximately 9,000 members, many of whom regularly use and enjoy Jackson Hole, Grand Teton National Park, and the surrounding lands.

9. Plaintiff Wyoming Outdoor Council ("WOC") is Wyoming's largest statewide conservation organization, with more than 1,600 members, and the state's leading advocate for natural resources conservation and environmental protection. WOC works to safeguard Wyoming's spectacular national parks and protected areas, vast national forests and other public lands, world-renowned wildlife and its habitat, blue-ribbon fisheries, and enviable air and water quality.

10. Members of each of the Plaintiff organizations visit the National Elk Refuge, Grand Teton National Park, and other areas within the Greater Yellowstone Ecosystem to observe and conserve wildlife, native landscapes, and unspoiled ecological processes. The Service's authorization of continued feeding operations within the National Elk Refuge will perpetuate unnaturally high densities of elk and bison on the range, causing unnatural wildlife behaviors and fueling the spread of wildlife disease, thereby resulting in significant, ecosystem-wide impacts. The legal violations alleged in this complaint accordingly cause direct injury to

the aesthetic, conservation, recreational, scientific, educational, and wildlife preservation interests of the members of the Plaintiff organizations.

11. These interests of Plaintiffs' members have been, are being, and, unless the relief sought here is granted, will continue to be adversely and irreparably injured by Defendants' failure to comply with federal law. These are actual, concrete injuries, traceable to Defendants' conduct, that would be redressed by the requested relief. Plaintiffs have no adequate remedy at law.

12. Defendant Dirk Kempthorne is Secretary of the U.S. Department of the Interior and, in that capacity, has oversight authority over all actions of the U.S. Fish and Wildlife Service ("Service"). Mr. Kempthorne is sued in his official capacity.

13. Defendant H. Dale Hall is Director of the U.S. Fish and Wildlife Service and, in that capacity, has management responsibility for all actions of the agency. Mr. Hall is sued in his official capacity.

14. Defendant Stephen Guertin is Regional Director for U.S. Fish and Wildlife Service Region 6 and, in that capacity, has management responsibility for the agency's actions in the region. Mr. Guertin is sued in his official capacity.

## STATUTORY FRAMEWORK

15. With the National Wildlife Refuge System Improvement Act of 1997, Congress declared that "[t]he mission of the [National Wildlife Refuge] System is to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans." 16 U.S.C. § 668dd(a)(2). In furtherance of this mission, the Refuge Improvement Act requires that refuge lands be

administered by the U.S. Fish and Wildlife Service to "provide for the conservation of fish, wildlife, and plants, and their habitats within the System" and to "ensure that the biological integrity, diversity, and environmental health of the System are maintained for the benefit of present and future generations of Americans[.]" Id. § 668dd(a)(4)(A)-(B); see also id. § 668dd(a)(3)(A) ("[E]ach refuge shall be managed to fulfill the mission of the System, as well as the specific purposes for which that refuge was established[.]"). The Service's "conservation" mandate requires that "healthy populations of fish, wildlife, and plants" be "sustain[ed] and, where appropriate, restore[d] and enhance[d.]" Id. § 668ee(4) (emphasis added).

16.  As the Service itself has affirmed, the "overarching goal" of the Refuge System is "to conserve a diversity of fish, wildlife, and plants and their habitats for the benefit of current and future generations[,]" thereby "maintain[ing] the biological integrity, diversity, and environmental health of each refuge ... and contribut[ing] to the conservation, and, where appropriate, restoration of representative ecosystems and ecological processes in the United States[.]" U.S. Fish and Wildlife Service Manual ("Service Manual"), Part 601, § 1.9(A) (Jan. 20, 2006); see also id. Part 601, § 3.7(A) (Apr. 16, 2001) ("[W]ildlife conservation is the singular National Wildlife Refuge System mission."). "Biological integrity" exists, under the agency's own definition, where "[b]iotic composition, structure, and functioning at genetic, organism, and community levels [are] comparable with historic conditions, including the natural biological processes that shape genomes, organisms, and communities." Id. Part 601, § 3.6(B). Accordingly, Service policy directs that populations be "manage[d] ... for natural densities and levels of variation[.]" Id. Part 601, § 3.14(C). Even when managing a refuge to support population levels within the larger ecosystem, the Service may "not ... allow densities to reach

excessive levels that result in adverse effects on wildlife and habitat"—such as "disease[.]" Id. Part 601, § 3.14(E).

17.     In preparing the challenged Management Plan, the Service also was subject to the requirements of the National Environmental Policy Act, under which federal agencies must prepare an environmental impact statement ("EIS") assessing and disclosing to the public the environmental effects of any proposed "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). NEPA requires that an EIS "[r]igorously explore and objectively evaluate all reasonable alternatives[.]" 40 C.F.R. § 1502.14(a); see also 42 U.S.C. § 4332(2)(C). An EIS must "[d]evote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits." 40 C.F.R. § 1502.14(b). NEPA, moreover, requires "a detailed discussion of possible mitigation measures" so that the agency and other interested parties "can properly evaluate the severity of the adverse effects." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 352 (1989); see also 42 U.S.C. § 4332(2)(C)(ii); 40 C.F.R. §§ 1502.14(f), 1502.16(h), 1508.25(b). Ultimately, an EIS must "sharply defin[e] the issues and provid[e] a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14.

18.     Finally, the Administrative Procedure Act provides for judicial review of federal agency actions. The Act authorizes a reviewing court to set aside any agency action, finding, or conclusion that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

## BACKGROUND

19. The National Elk Refuge's 24,700 acres were set aside by Congress in 1912 as a "winter game (elk) reserve." 37 Stat. 293 (1912). Situated in Jackson Hole, just north of the town of Jackson, Wyoming, the Refuge is flanked by the dramatic expanses of the Teton and Gros Ventre mountain ranges. Its land has long provided critical winter habitat for populations of elk, bison, and other wildlife migrating down from the higher elevations of the Greater Yellowstone Ecosystem. The combination of stunning scenery, spectacular wildlife, and ease of public access makes the National Elk Refuge one of the flagships of the nation's wildlife refuge system.

20. The U.S. Fish and Wildlife Service's decision to continue feeding the elk and bison now wintering in unnatural concentrations on the National Elk Refuge is the product of history, not science. In 1910, following a series of severe winters that markedly strained the elk population in Jackson Hole, individuals, organizations, and officials within the valley began providing food to the wintering elk herd. The feeding operations were, by popular measures, a success, reducing winter mortalities and thereby maintaining a larger elk population than would have otherwise survived on the winter range. In subsequent decades, numerous state-operated feedgrounds opened on state and federal lands in western Wyoming. With federal assistance, feeding continued on the National Elk Refuge as well, promoting animal densities in excess of those found on many elk farms. By 1980, Jackson Hole's bison joined the Refuge's feedlines. Last season, more than 8,000 elk and 900 bison crowded onto the Refuge.

### Wildlife Disease Transmission Within Concentrated Elk and Bison Populations

21. From their inception in 1910, artificial feeding operations within Jackson Hole have largely been considered a means of maintaining a larger elk population than could

otherwise be sustained in the area. In past decades, however, a number of wildlife diseases have emerged within the ecosystem—brucellosis and chronic wasting disease among them. These diseases flourish within unnaturally dense wildlife populations. As a result, the continued, concentrated feeding of elk and bison on the National Elk Refuge—an activity that was intended to benefit the Jackson herds—now sustains a wildlife disease tinderbox within the Greater Yellowstone Ecosystem.

22. In 1930, brucellosis was first discovered among the elk of Jackson Hole. While not fatal to the animals it infects, brucellosis causes pregnant elk and bison to abort their calves, leaving contaminated fetal tissues capable of transmitting the disease to other animals. Among naturally free-ranging elk populations, exposure to such tissues is relatively limited, minimizing transmission of the disease. Accordingly, brucellosis prevalence within Wyoming elk herds that do not frequent feedgrounds is approximately 2.3 percent; within unfed elk herds that do not share their range with infected elk, bison, or cattle, brucellosis prevalence is essentially zero. In contrast, brucellosis rates among elk on the National Elk Refuge have averaged around 17 percent in recent years, while rates in excess of 50 percent have elsewhere been documented among concentrated fed elk populations. Elk, in short, "do not maintain brucellosis in the absence of feedgrounds (excepting where they commingle with chronically infected bison). Thus, elk management reliant on winter feeding to maintain excessively large populations of elk clearly perpetuates chronically infected elk herds." Bruce L. Smith, Disease and Winter Feeding of Elk and Bison: A Review and Recommendation Pertinent to the Jackson Bison and Elk Management Plan and Environmental Impact Statement (Oct. 27, 2005), at 7.

23. The bison of Jackson Hole have proven even more efficient in transmitting brucellosis at the feedlines. Recent studies have documented brucellosis prevalence rates of 77 to 84 percent within the bison herd.

24. Though the biological impacts of brucellosis on wildlife populations are modest in comparison to those of chronic wasting disease (discussed infra), the economic impacts of the illness can be substantial. Studies have demonstrated that elk can transmit brucellosis to cattle; in recent decades, brucellosis outbreaks within cattle herds in and near the Greater Yellowstone Ecosystem have been attributed to infected elk. In light of the costs stemming from the infection of cattle herds and the possible loss of a state's brucellosis "class-free" status under U.S. Department of Agriculture rules, the Service's decision to perpetuate the feeding operations that spread brucellosis among the elk of the National Elk Refuge is both economically and ecologically unsound.

25. Unlike brucellosis, chronic wasting disease has yet to be discovered among the Refuge's elk. Nonetheless, the threat posed by the disease to the Refuge and its crowded population of wintering elk is acknowledged by disease experts to be much more grave. Chronic wasting disease is the elk form of "mad cow" disease. True to its name, chronic wasting disease is a slow, debilitating, incurable, and ultimately fatal illness that assaults the central nervous systems of elk, moose, and deer. While much remains unknown about the illness, it appears that chronic wasting disease—like "mad cow" disease (BSE), Creutzfeldt-Jakob disease, and scrapie, a disease of sheep and goats—stems from abnormal, non-living proteins known as "prions." These proteins are, among other things, exceptionally resistant to degradation once they enter the environment; in one study, for instance, scientists documented the contraction of chronic wasting disease by a mule deer confined within a paddock that had been occupied by an infected animal

more than two years before. Whether an area contaminated by chronic wasting disease prions can ever be disinfected is not known.

26. First recognized in a captive population of Colorado mule deer in 1967, chronic wasting disease has since been identified among the free-ranging elk and deer populations of numerous states, including Colorado, Wyoming, and Utah. While slow, the disease's westward progress in Wyoming has been steady. In 2003, infected mule deer were found only 90 miles east of the Jackson elk herd's range, at the foot of the Owl Creek and Absaroka Mountains on the Greater Yellowstone Ecosystem's southeastern periphery. As this region supports deer and elk populations that share seasonal ranges with the elk of Jackson Hole, biologists believe that the appearance of chronic wasting disease within the National Elk Refuge is inevitable.

27. Should concentrated feeding operations continue on the Refuge, the impact of chronic wasting disease on the Jackson herd—and, concomitantly, the broader ecosystem—threatens to be devastating. The concentrations of elk present on the Refuge during the winter feeding season present conditions almost ideal for the transmission of the illness. The incubation period for chronic wasting disease, moreover, extends from 12 to 34 months in elk, allowing a substantial portion of a population to become infected before the presence of the disease may be detected. As chronic wasting disease infection rates well in excess of 50 percent have been documented within confined elk and deer populations, the disease could afflict more than half the Jackson herd—far beyond the 1 to 3 percent infection rates observed within exposed but unfed populations. Such an epidemic would result in both extensive mortalities within the Refuge and the expansion of chronic wasting disease into other portions of the Greater Yellowstone Ecosystem, as the Jackson herd intermingles with other wildlife populations. The infection of the Refuge's elk would also lead to the contamination of the Refuge itself with

chronic wasting disease prions, rendering the range lethal to the very species it was set aside to sustain.

28. While not evident in its decision to continue feeding operations within Jackson Hole, the Service is well aware of the dangers chronic wasting disease poses to the Refuge and its elk. The Service's own EIS describes chronic wasting disease as an "[e]ventually fatal" illness with "no known treatment options" and "limited ... management options[.]" EIS at 136. The EIS further acknowledges that "[t]he density of animal populations ... likely play[s] a role [in the transmission of the disease] through faster and greater seeding of the environment with the prion agent and more animal-to-animal contact." Id. "In confined situations," the agency concedes, the prevalence of chronic wasting disease "can be much higher" than among naturally dispersed populations. Id. at 137. The Service therefore admits that the impact of chronic wasting disease on the Refuge could be both devastating and long-term: "If chronic wasting disease does become present in the [Jackson] herd, environmental contamination will become a major concern due to the disease's ability to persist in the environment for a long period of time, even after intensive efforts to eradicate it." Id.

29. The Service also makes little effort to suggest that chronic wasting disease—presently "within approximately 90 miles of the Jackson elk herd unit boundary[,]" EIS at 137—is somehow unlikely to infect the Refuge's elk. In the words of the Service's EIS, "[t]he spread of chronic wasting disease to the Jackson elk herd is possible, and it may be just a matter of time until it is introduced." Id. The Service, in fact, has gone so far as to concede that "[e]xperts believe that chronic wasting disease will at some time infect the herd." See Comments and Responses on the Draft Bison and Elk Management Plan and Environmental Impact Statement, at 200 (Response 47).

12

> The U.S. Fish and Wildlife Service ... can do little to prevent the Jackson Hole mule deer and elk from contracting chronic wasting disease from other ungulates outside the Jackson elk herd unit and transporting it into Jackson Hole. Some precautionary measures, such as reducing densities and numbers of elk and increasing dispersion, could reduce the chance of major adverse impacts if the disease became established.

EIS at 140.

30. Though the Service disregarded the importance of such measures in electing to perpetuate concentrated feeding operations on the National Elk Refuge, numerous state and local governments have done otherwise. Montana and Colorado, among other states, have enacted laws banning the feeding of elk and otherwise seeking to reduce elk densities. More notably, perhaps, the citizens of Jackson, Wyoming—the town that first fed the elk of Jackson Hole in 1910—themselves sponsored a ban on the private feeding of big game in 2003.

31. As the Service acknowledges in its EIS and Management Plan, chronic wasting disease and brucellosis are not the only diseases threatening the National Elk Refuge and the broader ecosystem. Bovine tuberculosis—a long-incubating and fatal illness that has been identified within captive elk populations in Montana, Oregon, and Colorado, among other states—would flourish along crowded elk and bison feedlines if introduced into the Refuge. Bovine paratuberculosis, scabies (which already exists among the Refuge's elk), and other illnesses could similarly spread among the concentrated herds of wintering bison and elk. In short, rather than sustaining viable populations of wildlife, the Service's continued feeding of the Jackson herds threatens an epidemic of various fatal and deleterious wildlife diseases.

### Broader Environmental Impacts of Concentrated Feeding Operations

32. The impact of the National Elk Refuge feeding operation on the Greater Yellowstone Ecosystem is not limited to the spread of disease. The concentration of elk and

bison on Refuge lands results in the loss of aspen, cottonwood, and willow stands to browsing, with corresponding losses among wildlife populations dependent upon such habitats, including migratory birds. The reduction in elk and bison mortalities stemming from winter feeding also affects those species that rely upon fallen animals for sustenance, including wolves, coyotes, and bears. Moreover, by drawing thousands of elk and bison to winter on the Refuge's lands, the feeding program alters natural migratory patterns, thereby disrupting the distribution of wildlife throughout the region. Therefore, the impacts of the Service's feeding program extend far beyond the bounds of the National Elk Refuge.

### The EIS and Management Plan

33.     In July 2001, the U.S. Fish and Wildlife Service announced its intention to prepare a management plan and environmental impact statement addressing the management of the bison and elk of the National Elk Refuge. Intent to Prepare a Management Plan and Environmental Impact Statement for Bison and Elk at the National Elk Refuge and Grand Teton National Park in Teton County, Wyoming, 66 Fed. Reg. 37,489 (Jul. 18, 2001). As the resulting plan was also to address bison and elk management within Grand Teton National Park, the National Park Service joined the Service in this effort. Id. Spurred in part by an order of this Court requiring an environmental analysis of the Refuge's winter feeding program, see Fund for Animals v. Clark, 27 F. Supp. 2d 8 (D.D.C. 1998), the agencies' "planning effort involve[d] the consideration of changes in how the elk and bison herds [were] currently managed on the National Elk Refuge and in Grand Teton National Park in order to meet legal obligations, to address problems related to high animal concentrations and effects on habitat, and to take advantage of unmet opportunities." EIS at 8. On July 21, 2005, the agencies released a draft management plan and EIS for public review and comment. Id. at 534. A majority of those

commenting on the documents expressed a preference for the elimination of winter feeding within the National Elk Refuge—contrary to the agencies' own preferred alternative. Id.

34. On February 2, 2007, the agencies published their final EIS. The EIS considered six alternative approaches to the management of the Jackson herds over a fifteen-year period. Two of the alternatives provided for the elimination of feeding operations on the Refuge; under a third, supplemental feed would have been offered to the herds in only the most severe winters. The agencies acknowledged that "[t]he risk of a non-endemic infectious disease quickly spreading through the elk population after being introduced into the herd would be lowest" under those alternatives providing for the elimination of supplemental feeding and corresponding reductions in population densities. Id. at 276, 311. The same alternatives, the agencies stated, "would also have the lowest risk of such a disease having major adverse impacts to survival and population sustainability." Id. at 276.

35. In their April 2007 Record of Decision and Final Management Plan, however, the agencies declined to adopt an alternative providing for the phasing out of feeding operations on the National Elk Refuge. Instead, the agencies elected to continue feeding operations on the Refuge—and give the Wyoming Game and Fish Department an effective veto with respect to any future decision to eliminate winter feeding on the Refuge. See Management Plan at 137. What is otherwise required under the agencies' plan is unclear. Generally, the plan requires that "[t]he Jackson bison and elk herds and their habitat ... be adaptively managed on the refuge and in [Grand Teton National Park], with an emphasis on improving winter, summer, and transitional range on park and refuge lands, while at the same time ensuring that the biotic integrity and environmental health of the resources [will] be sustained over the long term." EIS at 48 (emphasis added); Management Plan at xi. As to winter feeding in particular, the agencies—"in

close cooperation with the Wyoming Game and Fish Department"—are to "develop[]" and implement "[a] <u>dynamic framework</u> for decreasing the need for supplemental feeding on the refuge ... [that] would be based on existing conditions, trends, new research findings, and other changing circumstances." EIS at 48 (emphasis added); Management Plan at 135. In developing this "dynamic framework," "some or all" of the following factors are to be considered: the "level of forage production and availability on the National Elk Refuge[;]" the "desired herd sizes and sex and age ratios[;]" the "effective mitigation of bison and elk comingling with livestock on private lands[;]" the "winter distribution patterns of elk and bison[;]" the "prevalence of brucellosis, chronic wasting disease, and other wildlife diseases[;]" and, finally, "public support[.]" EIS at 48; Management Plan at 126. The agencies decided, in other words, to "adaptively manage" elk and bison through something called a "dynamic framework"— essentially a "plan to make a plan" that defers all relevant management decisions to a later date.

36.     Despite the uncertainty surrounding the "adaptive management actions" that will take place under the plan, the agencies have projected that "5,000 elk would be expected to winter on the refuge"—a modest decrease in light of recent numbers ranging from 5,000 to 8,000 animals. As to bison, the agencies' plan "[r]ecommend[s] that the Wyoming Game and Fish Department establish a genetically viable bison herd of approximately 500 animals[.]" <u>Id.</u> at 48; Management Plan at 126. By the agencies' own admission, the benefits of the plan are accordingly difficult to identify. "[T]he risk of chronic wasting disease becoming established in the Jackson elk herd[,]" for one, will be "similar to the risk under [present conditions] due to similar numbers of elk and frequent winter feeding." EIS at 294. As to brucellosis, the EIS predicts only a "minor to moderate" reduction in the rate of transmission among the Refuge's elk. <u>Id.</u> at 293. Thus, while the need for a management plan was largely driven by the

"increased risk of possibly serious disease impacts" and other harms stemming from the unnatural concentrations of animals wintering on the Refuge, see id. at 9, the Service has largely elected to maintain the status quo that perpetuates brucellosis and exposes elk wintering on the Refuge to the severe threat of an epidemic of lethal chronic wasting disease.

### FIRST CAUSE OF ACTION
### (Violation of the National Wildlife Refuge System Improvement Act)

37. All preceding paragraphs are hereby incorporated as if fully set forth herein.

38. Under the National Wildlife Refuge System Improvement Act, the Service is required to administer the National Wildlife Refuge System to "provide for the conservation of fish, wildlife, and plants, and their habitats within the System" and to "ensure that the biological integrity, diversity, and environmental health of the System are maintained for the benefit of present and future generations of Americans[.]" 16 U.S.C. § 668dd(a)(4)(A)-(B). As defined by the statute, "'conservation' ... mean[s] to sustain and, where appropriate, restore and enhance, healthy populations of fish, wildlife, and plants[.]" Id. § 668ee(4) (emphasis added).

39. The Service's decision to continue winter feeding operations on the National Elk Refuge violates these mandates. Rather than maintaining "healthy populations of ... wildlife," supplemental feeding of the Jackson herds sustains unnatural numbers and densities of wintering elk and bison. As the Service has itself admitted, the resulting elk and bison concentrations lead to high rates of brucellosis prevalence and leave the populations vulnerable to a devastating outbreak of chronic wasting disease, among other illnesses. The same elk and bison concentrations caused by winter feeding also threaten to contaminate the Refuge's soil with chronic wasting disease prions, compromising the "biological integrity" and "environmental health" of the Refuge and rendering it unfit for the elk it was set aside to sustain.

40. The Service's decision is thus arbitrary, capricious, not in accordance with the law, and in violation of the National Wildlife Refuge System Improvement Act. See 5 U.S.C. § 706(2)(A).

## SECOND CAUSE OF ACTION
### (Violation of NEPA)

41. All preceding paragraphs are hereby incorporated as if fully set forth herein.

42. Under the National Environmental Policy Act, an environmental impact statement must "provide full and fair discussion of significant environmental impacts" stemming from a proposed action and "inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. An EIS, therefore, must include "a detailed discussion of possible mitigation measures[,]" allowing the agency and other interested parties to "properly evaluate the severity of the adverse effects." Robertson, 490 U.S. at 352. As its proposed action, however, the Service selected a plan to work with the Wyoming Game and Fish Department in developing and implementing "[a] dynamic framework for decreasing the need for supplemental feeding on the refuge[,]" EIS at 48—a plan, in other words, to make a plan. The "adaptive management actions" to be taken under any resulting "framework" are not defined; the Service's selected alternative does not go so far, even, as to dictate what considerations are to govern the development of the plan, providing only that thought should be given to "some or all" of six factors, one of which is disease. Id. As a result, the Service's EIS fails to adequately disclose and discuss the environmental impacts of its selected alternative, under which the assessment and selection of mitigation measures are left for a later date. Absent an understanding of what actions will in fact be taken under the management plan, the Service and the public have no means of considering the impacts of the selected alternative relative to all other options.

43. The EIS is thus arbitrary, capricious, and not in accordance with the law. <u>See</u> 5 U.S.C. § 706(2)(A).

**REQUEST FOR RELIEF**

THEREFORE, Plaintiffs respectfully request that this Court:

1. Declare that the Record of Decision and Management Plan violate the National Wildlife Refuge System Improvement Act of 1997 by continuing winter feeding operations and thereby failing to sustain "healthy populations" on the National Elk Refuge;

2. Declare that the Record of Decision and Management Plan violate the National Wildlife Refuge System Improvement Act of 1997 by maintaining conditions that threaten to contaminate the Refuge with chronic wasting disease prions, contrary to the Service's duty to maintain the "biological integrity" and "environmental health" of the National Elk Refuge;

3. Declare that the EIS violates NEPA by failing to detail the actions to be taken with respect to winter feeding under the preferred alternative and any available mitigation measures, thereby frustrating the purposes of environmental disclosure and analysis;

4. Remand the EIS, Record of Decision, and Management Plan, and require preparation of a new EIS, Record of Decision, and Management Plan consistent with the requirements of NEPA and the Refuge Improvement Act;

5. Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, associated with this litigation; and

6. Grant Plaintiffs such other and further relief as the Court may deem proper.

Respectfully submitted this __3__ rd day of June, 2008,

/s/ Timothy J. Preso
Timothy J. Preso (D.C. Bar # 456531)
tpreso@earthjustice.org
Sean M. Helle (D.C. Bar # 490085)
shelle@earthjustice.org
Earthjustice
209 South Willson Avenue
Bozeman, MT 59715
(406) 586-9699
Fax: (406) 586-9695

Sierra B. Weaver (D.C. Bar # 488560)
SWeaver@defenders.org
Defenders of Wildlife
1130 17th Street NW
Washington, D.C. 20036
(202) 682-9400
Fax: (202) 682-1331

Robert Morgan (D.C. Bar # 254565)
rmorgan@refugeassociation.org
National Wildlife Refuge Association
1901 Pennsylvania Ave, NW, Suite 407
Washington, D.C. 20006
(202) 333-9075
Fax: (202) 333-9077