UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DEFENDERS OF WILDLIFE, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Case No. 08-0945 (RJL) |
| ) | |
| KENNETH L. SALAZAR, in his official ) | |
| capacity as Secretary of the Interior, *et* ) | |
| *al.*,[1] ) | |
| ) | |
| Defendants, ) | |
| ) | |
| and ) | |
| ) | |
| STATE OF WYOMING, ) | |
| ) | |
| Defendant-Intervenor. ) | |

MEMORANDUM OPINION
(March 26, 2010) [#24, 26, and 27]

Before the Court are dueling Motions for Summary Judgment arising from a dispute over the management of the National Elk Refuge in Jackson Hole, Wyoming. Defenders of Wildlife and their fellow plaintiffs challenge the comprehensive Bison and Elk Management Plan adopted jointly by the United States Fish and Wildlife Service ("FWS") and the National Park Service ("Park Service") (collectively, "the agencies"). The plaintiffs ask that the plan be set aside because it permits the indefinite feeding of elk on the Refuge despite

---

[1] Former Secretary of the Interior, Dirk Kempthorne, and former Director of the United States Fish and Wildlife Service, H. Dale Hall, were originally named as defendants in this case. Pursuant to Federal Rule of Civil Procedure 25(d), if a public officer named as a party to an action in his official capacity ceases to hold office, the court will automatically substitute that officer's successor. Accordingly, the Court substitutes Kenneth L. Salazar for Kempthorne and Sam D. Hamilton for Hall.

what they regard as overwhelming evidence that continued artificial feeding will lead to the catastrophic spread of disease and will disrupt the biological integrity of the Refuge, in violation of the National Wildlife Refuge System Improvement Act ("the Improvement Act"). The plaintiffs also contend that the plan and the accompanying environmental impact statement ("EIS") violate the National Environmental Policy Act ("NEPA") because they are insufficiently detailed to allow a reasonably complete discussion of mitigation. The defendants include the federal officials charged with administering the Refuge and the intervenor State of Wyoming. Together they contend that the plan constitutes a valid exercise of discretion and that it and the EIS are sufficiently detailed to satisfy the requirements of NEPA. Based on a review of the record and pleadings, the plaintiffs' Motion for Summary Judgment is DENIED, and the defendants' respective Cross Motions for Summary Judgment are GRANTED.

## BACKGROUND

About a decade ago, the FWS and the Park Service initiated a process to develop a comprehensive plan for the management of bison and elk on the National Elk Refuge ("the Refuge") and other federal land. (*See* Final Bison and Elk Management Plan and Environmental Impact Statement (AR FR017a) ("FEIS Vol. 1") at 3).[2] The agencies considered a wide range of issues in formulating the plan, one of which was the wintertime practice of feeding the bison and elk. (*Id.* at 20-22). Supplemental feeding of elk began about a century ago as a means to reduce elk mortality during the winter and to minimize

---

[2] The Park Service joined the planning process because, in addition to the Refuge, the plan also addresses the management of bison and elk in the Grand Teton National Park. (*See* FEIS Vol. 1 at 3).

the likelihood of elk feeding on hay meant for livestock. (*Id.* at 6). More recently, bison also began eating the supplemental elk feed provided on the Refuge. (*Id.* at 7). Over the years, this practice has had the salutary effect of reducing elk winter mortality, sustaining a larger elk population than would have otherwise survived on the region's winter range, and reducing elk contact with haystacks and pastures for livestock. (*Id.* at 10).

Notwithstanding these benefits, the winter feeding program is not without potential costs. For instance, artificial feeding attracts more bison and elk than the Refuge can support, thus damaging the native habitat. (*Id.* at 9). The large concentration of elk and bison along the feedlines also contributes to the spread of disease. (*Id.* at 9-10; Smith Report (AR S007) at 3-4, 15-19). Of particular concern is the threat of Chronic Wasting Disease ("CWD"), the equivalent of "mad cow disease." (FEIS Vol. 1 at 136). Although CWD has not yet been detected on the Refuge, experts believe that it will eventually infect the elk and bison population. (*Id.* at 137; FEIS Vol. 2 at 200). The disease is generally fatal, and because it is difficult to eradicate, it could lead to population decline and possibly to the extinction of bison and elk on the Refuge. (FEIS Vol. 1 at 274, 514; Peterson CWD Report (AR S008) at 3). CWD is not the only disease that could spread as a result of artificial feeding practices; there are a host of other debilitating diseases as well. (*See, e.g.*, FEIS Vol. 1 at 129-33; *id.* at 133 (footrot); *id.* at 134-35 (bovine tuberculosis); *id.* at 133-34 (scabies); *id.* at 135 (bovine paratuberculosis)).

During the planning process, the agencies developed six alternatives to address the effects of the winter feeding program. The agencies' preferred alternative—Alternative 4— aims over a fifteen-year period to "decrease reliance on intensive supplemental winter

3

feeding, including complete transition to free-standing forage if and when several established criteria are met, including support from the Wyoming Game and Fish Department and the public." (FEIS Vol. 1 at 67). This alternative is predicated on the view that the agencies must improve the natural habitat supporting the bison and elk before they can discontinue supplemental feeding. Lest there be any doubt that the agencies intend to eliminate the feeding program, they rejected Alternative 5, which proposed the indefinite continuation of the program. (*Id.* at 50). In contrast to the conditions-based approach preferred by the agencies, Alternative 6, which the plaintiffs prefer, sets a time-sensitive goal of phasing out the winter feeding program within five years. (*Id.* at 52, 68).

To implement Alternative 4, the agencies developed and approved the Bison and Elk Management Plan now under review. The plan establishes four goals: (1) conserving the native habitat, (2) promoting sustainable populations of bison and elk, (3) helping the Wyoming Game and Fish Department ("WGFD") maintain its herd objectives, and (4) preventing the spread of disease. (Final Bison and Elk Management Plan (AF FR018a) ("FBEMP") at 129-39). To achieve these goals, the plan provides for the adaptive management of the bison and elk herds and their habitat with an "emphasis on improving winter, summer, and transitional range on refuge and park lands, while at the same time ensuring that the biotic integrity and environmental health of the resources will be sustained over the long term." (*Id.* at 125). More specifically, the plan directs the agencies to initiate habitat conservation projects for the improvement of forage and to work with adjacent landowners and the WGFD to minimize bison and elk feeding on private land. (*Id.*). Under the plan, the agencies will also coordinate with the WGFD to maintain an elk herd

population of approximately 11,000—almost half of which will be expected to winter on the Refuge—and to sustain a genetically viable bison herd of about 500. (*Id.* at 126). As these measures are implemented, the agencies will gradually transition away from supplemental feeding based on yet-to-be-determined triggers derived from some or all of the following factors: (1) the "level of forage production and availability" on the Refuge; (2) the "desired herd sizes and sex and age ratios"; (3) the "effective mitigation of bison and elk co-mingling with livestock on private lands"; (4) the "winter distribution patterns of elk and bison"; (5) the "prevalence of brucellosis, chronic wasting disease, and other wildlife diseases"; and (6) "public support." (*Id.* at 125-26). In short, the plan is designed "for progressively transitioning from intensive supplemental winter feeding to greater reliance on free-standing forage." (*Id.*).

## DISCUSSION

### I.  Standard of Review

The plaintiffs seek to set aside the agencies' comprehensive Bison and Elk Management Plan and the accompanying Final Environmental Impact Statement on grounds that the agencies violated the Improvement Act and NEPA. The plaintiffs bring their challenge under the Administrative Procedure Act ("APA"), which requires this Court to set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). To satisfy that standard, an agency need only "examine the

5

relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (internal quotation marks omitted). Because this case involves judicial review of final agency action, the normal summary judgment standard under Federal Rule of Civil Procedure 56(c) does not apply. *N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 79 (D.D.C. 2007).

## II. Improvement Act Claim

The crux of the plaintiffs' claim is that the Bison and Elk Management Plan does not commit to a date-certain termination of the winter feeding program. Instead of phasing out the program in five years, as the plaintiffs think is necessary, the agencies have decided to phase out the program over time as certain conditions are met. Because this conditions-based approach leaves open the possibility that supplemental feeding will continue indefinitely, the plaintiffs contend that the plan adopted by the agencies is contrary to the Improvement Act or is—at a minimum—arbitrary, capricious, or an abuse of discretion. I disagree.

The Improvement Act established the National Wildlife Refuge System, the mission of which "is to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans." 16 U.S.C. § 668dd(a)(2). To carry out this mission, the Act directs the Secretary of the Interior to perform a wide range of duties. For instance, the Secretary must "provide for the conservation of fish, wildlife, and plants, and their habitats within the System." *Id.* § 668dd(a)(4)(A). Under the Act, "conservation" means "to sustain and,

where appropriate, restore and enhance, healthy populations of fish, wildlife, and plants utilizing . . . methods and procedures associated with modern scientific resource programs." *Id.* § 668ee(4). The Secretary must also "ensure that the biological integrity, diversity, and environmental health of the System are maintained for the benefit of present and future generations of Americans." *Id.* § 668dd(a)(4)(B). In addition to these conservation duties, the Secretary must, among many others things, "ensure effective coordination, interaction, and cooperation with owners of land adjoining refuges," *id.* § 668dd(a)(4)(E); "ensure that opportunities are provided within the System for compatible wildlife-dependent recreational uses," *id.* § 668dd(a)(4)(I); and "ensure timely and effective cooperation and collaboration with Federal agencies and State fish and wildlife agencies," *id.* § 668dd(a)(4)(M).

The plaintiffs contend that the Bison and Elk Management Plan defeats the overarching mission of the Refuge and violates specific mandates of the Improvement Act concerning conservation. In particular, they claim that the plan fails to provide for the conservation of bison and elk, as well as their habitats, *see id.* § 668dd(a)(4)(A), and to ensure that the biological integrity, diversity, and environmental health of the Refuge are maintained, *see id.* § 668dd(a)(4)(B). Central to this claim is the presumably indefinite continuation of the winter feeding program, the adverse effects of which the plaintiffs take great care to detail. They explain how the unnaturally large density of bison and elk caused by supplemental feeding damages the surrounding habitat and facilitates the transmission of debilitating and deadly diseases that could lead to the decline, if not extinction, of bison and elk on the Refuge. Because the plan does not mitigate these adverse effects by requiring the elimination of the feeding program within at least five years, the plaintiffs contend that the

plan fails its clear statutory obligations to sustain a healthy population of bison and elk, to conserve the Refuge's habitat, and to ensure the biological integrity, diversity, and environmental health of the Refuge. Furthermore, the plaintiffs contend that the Improvement Act's conservation mandates "trump" whatever other duties the agencies have under the statute. (Pl. Reply [#30] at 8). Therefore, because the plan elevates the agencies' duties to coordinate with private landowners, to ensure recreational opportunities, and to work with the WGFD all at the expense of its conservation duties, the plaintiffs assert that the plan is contrary to the Improvement Act and must be set aside. Not so.

As an initial matter, at least one thing is clear: The Improvement Act does not mandate that any *particular* plan be adopted. The statute gives broad direction, not precise instruction. *Wyoming v. United States*, 279 F.3d 1214, 1239-40 (10th Cir. 2002) (noting the "broad language and general directives" of the Improvement Act). It requires, for instance, that agencies "provide for the conservation" of wildlife, "ensure . . . the biological integrity, diversity, and environmental health" of the Refuge, and "plan and direct the continued growth of the [Refuge] System in a manner that is best designed to accomplish the mission of the System." 16 U.S.C. § 668dd(a)(4)(A)-(C). How the agencies carry out these sweeping directives is a matter of considerable, though not unlimited, discretion. The statute says nothing about whether supplemental feeding should be phased out based on an established timeline or based on specific conditions. Indeed, it says nothing at all about supplemental feeding. The question before the Court, therefore, is not whether the Bison and Elk Management Plan violates any specific statutory provision (it does not), but whether the plan is arbitrary, capricious, or an abuse of discretion. It is not.

In making that determination, this Court, of course, does not stand in the agencies' shoes. Rather, its task is limited to determining whether the agencies have, at a minimum, articulated a "satisfactory explanation" that establishes a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (internal quotation marks omitted). In particular, I must consider whether the agencies' explanation "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (internal quotation marks omitted). Simply stated, the Court has no legal authority to disturb the agencies' plan so long as it takes account of all the relevant factors set forth in the Improvement Act (and no others) and is reasonable based on the facts.

Having examined the administrative record and considered the rationale for the agencies' chosen course of action, I cannot say that the Bison and Elk Management Plan either fails to account for relevant factors or is unreasonable for phasing out the winter feeding program over a fifteen-year time horizon as conditions for doing so are met. Indeed, the plaintiffs themselves acknowledge that an immediate cessation of supplemental feeding would have "significant adverse environmental consequences." (Pl. Mot. for Summ. J. [#24-2] at 37). Instead, their chief complaint is that the adopted plan does not commit to certain elimination of the feeding program within an established timeline. The agencies' decision, however, is a reasonable one in light of the provisions and purposes of the Improvement Act. As the plaintiffs concede, supplemental feeding is necessary, for now, to maintain natural population levels during the winter. According to the agencies' environmental impact statement, "the wintering of unnaturally high densities of elk on the

refuge helps sustain a more natural population level at the larger landscape level by mitigating the loss of winter range." (FEIS Vol. 1 at 13). Because the pace at which the feeding program can be phased out depends upon the pace at which winter forage on the Refuge can be improved, the "[p]remature termination of feeding, while elk and bison numbers exceed winter habitat capacity, could result in unacceptable winter losses." (Smith Report (AR S007) at 9). For this reason, the agencies' decision to discontinue the program based on conditions on the ground, as opposed to a fixed timeline, makes considerable sense.[3]

That the agencies seek to avoid losses of bison and elk caused by the lack of winter habitat is hardly contrary to the conservationist provisions of the Improvement Act or the overarching purposes of the Refuge. After all, the point of a "refuge" is to shelter wildlife displaced by human development. *See* 16 U.S.C. § 673a (providing that Refuge land is to be used "for the grazing of, and as a refuge for, American elk and other big game animals").

---

[3] The plaintiffs' argument that the plan gives the WGFD an effective veto over any decision to terminate the winter feeding program is overblown. To be sure, the plan provides that a "complete transition to free-standing forage" will occur "when several established criteria are met, *including support from the Wyoming Game and Fish Department and the public.*" (FBEMP at 137 (emphasis added)). But this requirement to gain the support of the WGFD and the public is consistent with, if not required by, the Improvement Act itself, which directs the agencies "to increase support for the [Refuge] and participation from conservation partners and the public," 16 U.S.C. § 668dd(a)(4)(C), and to "ensure effective coordination, interaction, and cooperation with . . . the fish and wildlife agency" of the state in which the Refuge is located, *id.* § 668dd(a)(4)(E). Of course, if the WGFD and the public refuse to support termination of the feeding program even once the conditions are ripe for doing so, then nothing would prohibit the agencies from discontinuing the program without WGFD or public support. *See Wyoming*, 279 F.3d at 1234 ("[F]ederal management and regulation of federal wildlife refuges preempts state management and regulation of such refuges . . . where state management and regulation stand as an obstacle to the accomplishment of the full purposes and objectives of the Federal Government.").

And while the threat of disease is real and must be addressed, it makes little sense to avert population decline caused by disease only to bring about population decline caused by starvation. Thus, the agencies did not err by defining "healthy populations," which the Improvement Act does not specifically define, as including "a stable and continuing population (i.e., the population returns to an initial equilibrium after being disturbed) and a minimized likelihood of irreversible long-term effects." (FEIS Vol. 1 at 12). This interpretation of the Improvement Act, which the agencies administer, is entitled to deference. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984) (stating that the Supreme Court has "long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer").

Of course, the Bison and Elk Management Plan might well have been unreasonable had the agencies categorically refused to phase out the winter feeding program in spite of all the evidence in the record about the dangers of supplemental feeding. But the agencies did not do that. Far from mandating a continuation of the feeding program in perpetuity, the agencies have adopted a plan that takes measures to improve the Refuge so that the bison and elk that winter there can survive without supplemental feeding. The rate at which the program should be discontinued is necessarily a fact-dependent determination. Thus, by making the termination of winter feeding contingent, not on an arbitrary timeline, but on the Refuge's ability to support the bison and elk herd, the plan strikes a reasonable balance between maintaining population levels and mitigating disease, both of which are necessary to achieve the overarching conservationist purpose of the Refuge as a natural shelter for

displaced bison and elk. It matters not whether this Court believes it to be the right balance. The Court's sole task is to determine whether the agencies have articulated a satisfactory explanation for the balance they have struck given the factual record. They have!

### III. NEPA Claim

The plaintiffs also seek to set aside the Bison and Elk Management Plan on the ground that the environmental impact statement, which accompanies the plan, violates NEPA. Under that statute, agencies proposing a major federal action must include a "detailed statement" of, among other things, "the environmental impact of the proposed action" and "any adverse environmental effects which cannot be avoided should the proposal be implemented." 42 U.S.C. § 4332(2)(C)(i), (ii). To satisfy the latter requirement, the EIS must contain "a reasonably complete discussion of possible mitigation measures." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351-52 (1989). The plaintiffs do not contend that the EIS lacks a detailed statement of the environmental impacts; instead, they contend that the adaptive management plan, which they regard as a "plan to make a plan," (Pl. Mot. for Summ. J. [#24-2] at 21), is insufficiently detailed to allow for a reasonably complete discussion of mitigation measures. I disagree.

This Court has rejected that kind of argument once before and will do so again in this case. In *Theodore Roosevelt Conservation Partnership v. Salazar*, I disagreed with TRCP's argument—nearly identical to the one here—that an "adaptive-management-mitigation plan [was] 'so amorphous and ill-defined' that the agency was unable to determine the environmental consequences of the project and thus unable to take the requisite 'hard look' at the project's effect on the environment." 605 F. Supp. 2d 263, 279 (D.D.C. 2009) (Leon,

J.). In rejecting that argument, I noted that the agency's plan incorporated numerous specific mitigation techniques. *Id.* I also rejected TRCP's characterization of the plan as "equivalent to a decision to 'act now and deal with environmental consequences later,'" and I emphasized that "NEPA does not prevent agencies from adopting mitigation techniques and acknowledging they may be adjusted later depending on their effectiveness." *Id.* at 280.

Even though the agencies have yet to fill in every detail (which is to be expected of an adaptive management plan), the Bison and Elk Management Plan and EIS incorporate enough mitigation measures to provide a reasonably complete discussion of mitigation. For instance, the plan aims to mitigate the adverse effects of supplemental feeding by dispersing the feeding areas, (*see* FBEMP at 139); changing feed sites daily, (*id.*); spreading feed along meandering lines, (*id.*); delaying the onset of feeding each year, (FEIS Vol. 1 at 67); reducing the average daily ration of feed per elk or bison, (*id.*); decreasing the number of days each year of supplemental feeding, (*id.*); increasing harvest levels, (*id.*); vaccinating the bison and elk for brucellosis, (FEIS Vol. 1 at 73; FBEMP at 139); and increasing surveillance for CWD, (FEIS Vol. 1 at 40, 73; FBEMP at 126-27, 139). Again, the Court's role is a limited one—"to determine whether the EIS was compiled with objective good faith and whether the resulting statement would permit a decisionmaker to fully consider and balance the environmental factors." *Sierra Club v. Adams*, 578 F.2d 389, 393 (D.C. Cir. 1978) (internal quotation marks omitted). Having reviewed the administrative record, which includes a thorough two-volume EIS, I am confident that the agencies' preferred alternative and the plan based upon it are sufficiently detailed to provide a reasonably complete discussion of mitigation. In short, I conclude that the agencies have satisfied their

obligations under NEPA and that they have adequately addressed the possible environmental impacts and mitigation measures relating to their Bison and Elk Management Plan.

## CONCLUSION

This case is an excellent example of how policy disputes too often end up in federal courts. Although the plaintiffs prefer a plan that would phase out the winter feeding program within five years, other stakeholders, including other environmental groups, prefer plans that would phase out the program over longer periods.[4] Fearing that premature termination of the program would adversely affect population levels, the agencies ultimately rejected the rigid five-year deadline that the plaintiffs advocate and opted instead for a plan that would phase out supplemental feeding as conditions for doing so were achieved. Unhappy with that result, the plaintiffs—quite predictably—turned to the courts. Unfortunately for the plaintiffs, this Court will not insinuate itself into the business of managing a wildlife refuge—a task that is well beyond its competence. Content that the agencies have articulated a satisfactory explanation for their chosen course of action and have adequately addressed mitigation for purposes of NEPA, I DENY the plaintiffs' Motion for Summary Judgment and GRANT the defendants' respective Cross Motions for Summary Judgment.

*[signature]*
RICHARD J. LEON
United States District Judge

---

[4] The National Wildlife Federation, for instance, supported the agencies' preferred alternative, stating that "it is in the best interest of wildlife to discontinue winter feeding, however, a strategic, methodical approach to reducing feeding is preferable than eliminating feeding too quickly." (FEIS Vol. 2 at 150).